**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**                    **FOR PUBLICATION**
----------------------------------------------------------X
In re:                                                                      Adv. Pro. No. 08-01789 (BRL)

SECURITIES INVESTOR PROTECTION                          SIPA LIQUIDATION
CORPORATION,                                                        (Substantively Consolidated)

                              Plaintiff-Applicant

                    v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                              Defendant.
----------------------------------------------------------X
In re:

BERNARD L. MADOFF,

                              Debtor.
----------------------------------------------------------X
IRVING H. PICARD, Trustee for the
Liquidation of BERNARD L. MADOFF
INVESTMENT SECURITIES LLC,

                                                                            Adv. Pro. No. 11-02732 (BRL)

                              Plaintiff,

                    v.

BUREAU OF LABOR INSURANCE,

                              Defendant.
----------------------------------------------------------X
APPEARANCES**:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:     (212) 589-4200
Facsimile:     (212) 589-4201
By:     David J. Sheehan
          Thomas L. Long
          Mark A. Kornfeld
          Regina Griffin
          Torello Calvani
          Michelle Kaplan
          Catherine Woltering
          Constantine P. Economides

*Attorneys for Irving H. Picard, Esq., Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

LOWENSTEIN SANDLER PC
1251 Avenue of the Americas
New York, New York 10022
Telephone:    (212) 262-6700
Facsimile:    (212) 262-7402
By:    Michael B. Himmel
        Amiad M. Kushner
        Jamie R. Gottlieb

*Attorneys for Defendant Bureau of Labor Insurance*


Before: Hon. Burton R. Lifland
            United States Bankruptcy Judge


## MEMORANDUM DECISION AND ORDER DENYING BLI'S MOTION TO DISMISS THE TRUSTEE'S COMPLAINT

Before the Court is the motion (the "Motion to Dismiss") of the Taiwanese Bureau of Labor Insurance ("BLI") seeking to dismiss the complaint (the "Complaint") of Irving H. Picard, Esq. (the "Trustee"), trustee for the substantively consolidated Securities Investor Protection Act[1] ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), filed pursuant to SIPA sections 78fff(b), 78fff-1(a) and 78fff-2(c)(3), sections 105(a), 544, 550(a) and 551 of the Bankruptcy Code (the "Code") and various sections of New York Debtor and Creditor Law (the "NYDCL")[2] to recover certain transfers allegedly received by BLI as a subsequent transferee of funds originating from BLMIS.

BLI moves to dismiss the Complaint on four grounds:[3] (i) this Court lacks subject matter jurisdiction because BLI is immune from liability under the Foreign Sovereign Immunities Act (the "FSIA"); (ii) this Court lacks personal jurisdiction over BLI; (iii) the Trustee cannot recover

---

[1]  15 U.S.C. § 78aaa *et seq.*  Hereinafter "SIPA" shall replace "15 U.S.C." in reference to SIPA sections.

[2]  N.Y. Debt. & Cred. Law §§ 273-279 (McKinney 2001).

[3]  In contravention of Local Bankruptcy Rule 9013-1, BLI failed to specify the statutory provisions upon which its motion is predicated.  *See* Local Bankruptcy Rule 9013-1 ("Each motion shall specify the rules and statutory provisions upon which it is predicated . . . .").  It appears, however, that BLI is moving to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), (2) and (6).

from BLI, as subsequent transferee, under section 550 of the Code ("Section 550") because he

has not avoided the initial transfers from BLMIS to Fairfield Sentry Limited ("Fairfield Sentry"

or the "Fund") and cannot now do so because the relevant statute of limitations has expired; and

(iv) the Trustee's claims are barred by the presumption against extraterritoriality, which prohibits

the extraterritorial application of Section 550 against BLI.  The Trustee argues to the contrary,

contending that the Court has both subject matter and personal jurisdiction, and may use Section

550 to recover subsequent transfers from BLI.

At bottom, the Trustee's instant suit is based upon BLI's investment of tens of millions of

dollars in Fairfield Sentry with the specific goal of having funds invested in BLMIS in New

York, with intent to profit therefrom.  Such investment was not haphazard.  Rather, BLI

intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money

orchard in the United States and reap the benefits therefrom.

For the reasons set forth below and at oral argument, the Motion to Dismiss is DENIED.

## BACKGROUND[4]

The Trustee's instant action arises from the commercial relationship between Fairfield

Sentry, the largest BLMIS feeder fund, and defendant BLI, an agency or instrumentality of the

Republic of China (the "ROC") (commonly known as Taiwan).  BLI is a political branch of the

ROC responsible for labor safety policies and handling investments of the Labor Insurance Fund.

*See* Declaration by Tsai, Chung-Chun in Support of Defendant's Motion to Dismiss Plaintiff's

First Amended Complaint ("Tsai Decl.") (Dkt. No. 9), ¶ 4.  BLI is statutorily authorized to invest

"in any [] government-authorized projects, which may inure to the benefit of their Fund,"

*id.*, ¶ 6(e), including "[h]edge funds issued by the foreign fund management institutions,"

---

[4]  A comprehensive discussion of the facts underlying this SIPA liquidation and Madoff's notorious Ponzi scheme is
set forth in this Court's March 1, 2010 net equity decision.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff
Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010).

*id*., ¶ 8(c).

Prior to investing in Fairfield Sentry, BLI hired an investment advisor agent, Union Securities Investment Trust Co. Ltd. ("Union Securities"), to conduct diligence on Fairfield Sentry. As part of this diligence, Fairfield Greenwich Group, the entity controlling Fairfield Sentry furnished BLI with a private placement memorandum and other general information about the Fund. BLI also received specific information about the Fund's investment strategy, along with past results and details of specific trades in the Standard & Poor's 100 Index ("S&P 100"). *See, e.g.*, Declaration of Thomas L. Long in Support of the Trustee's Memorandum of Law in Opposition to the Motion to Dismiss of the Bureau of Labor Insurance ("Long Decl.") (Dkt. No. 17), Ex. 1, pp. 1–6, 10. Union Securities learned that the Fund's "strategy is executed by Bernard L. Madoff Securities," *id.* at Ex. 1, p. 2, and that a minimum of 95% of the Fund's assets would be held in BLMIS's custody in New York and invested in U.S. Securities and Treasuries, *id.* at Ex. 4 (Private Placement Memorandum of Fairfield Sentry Limited, as of October 1, 2004) [hereinafter "2004 PPM"], p. 15; Supplemental Declaration of Thomas L. Long in Support of the Trustee's Sur-Reply in Opposition to the Motion to Dismiss of the Bureau of Labor Insurance ("Long Supp. Decl.") (Dkt. No. 46), Ex. 1 (Private Placement Memorandum of Fairfield Sentry Limited, as of August 14, 2006) [hereinafter "2006 PPM"], pp. 9-10.

Armed with this knowledge, BLI chose to invest in Fairfield Sentry for the following reasons:

> (I) [T]he history and asset size of [Fairfield Sentry] were in accordance with the relevant rules of the BLI; (2) [Fairfield Sentry] had a stable and steady annualized return rate of 11.02% and a Sharpe ratio of 2.81 since its foundation in 1990; (3) Investing in [Fairfield Sentry] met other requirements of BLI's policy.

Tsai Decl., ¶ 9. In order to invest with the Fund, BLI either individually or with the aid of Union Securities appears to have opened one or more accounts with JPMorgan Chase Bank in New

4

York.  *See* Long Decl., Ex. 3 (Subscription Agreement between BLI and Fairfield Sentry Limited, as Executed on January 4, 2007) [hereinafter "Subscription Agreement" or "Agreement"], pp. 1–2, 4, 11.

### The Controlling Documents

On January 4, 2007, BLI signed the Subscription Agreement with Fairfield Sentry. *See id*. at p. 11.  In accordance with this Agreement, BLI appointed Union Securities as its advisor.  *See id.* at pp. 3–4.  BLI acknowledged in the Agreement that it was a "Professional Investor," and "warrant[ed] that [it] has such knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in [Fairfield Sentry]."  *Id*. at p. 3, ¶ 5(c).  BLI also indicated that it had "obtained sufficient information from [Fairfield Sentry] or its authorized representatives to evaluate such risks and ha[d] consulted with [its] own advisors and is fully informed as to the legal and tax requirements within the Subscriber's own country (countries) regarding a purchase of the Shares [of Fairfield Sentry]."  *Id*. at p. 4, ¶ 8.

The Subscription Agreement expressly incorporated the 2004 PPM and, by amendment, the 2006 PPM (taken together, the "PPMs").  *See id.* at p. 1, ¶ 1.  The PPMs clearly highlighted the prominent role of New York-based BLMIS's split strike conversion strategy (the "SSC Strategy")[5] in Fairfield Sentry's investments.  The 2006 PPM clearly stated:

> As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ("BLM[IS]") as execution agent of the split strike conversion strategy, *substantially all of the Fund's assets will be held in segregated accounts at BLM[IS], a U.S. registered broker-dealer and qualified custodian*.

2006 PPM, p. 16 (emphasis added).  During those times when BLMIS's SSC strategy was not in the U.S. equity markets, investor funds were used to purchase U.S. Treasury Bills.

---

[5] The SSC Strategy involved entering the U.S. equity markets six to eight times a year through the purchase of shares of companies composing the S&P 100 and OEX 100 put options, along with the sale of OEX 100 call options.  *See* 2006 PPM, pp. 9-10.

*See* Compl., ¶ 25.  In addition, the PPMs set forth that BLMIS would retain custody of at least 95% of the Fund's assets in the United States and would determine which shares of companies on the S&P 100 would be purchased, as well as the timing of such purchases.  *See* 2006 PPM, pp. 9-10 ("Investment Policies"); p. 21, ¶ 17 ("When the Fund invests utilizing the 'split strike conversion' strategy . . . it will not have custody of the assets so invested."); *see also* 2004 PPM, p. 15 ("BLM[IS] has approximately 95% of the Fund's assets under custody.").  The 2006 PPM further clarified that "[t]he services of BLM[IS] and its personnel are essential to the continued operation of the Fund, and its profitability, if any."  2006 PPM*,* p. 10.  Fairfield Sentry's investment manager, Fairfield Greenwich (Bermuda) Ltd., had the discretion to invest less than 5% of the fund's net asset value outside of BLMIS's SSC strategy, with the rest going to BLMIS.  *Id.* ("The Investment Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets [] never to exceed, in the aggregate, 5% of the Fund's Net Asset Value").

The Agreement further memorializes the connections between BLI and New York in several additional ways.  First, BLI "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York" and "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding." Subscription Agreement, p. 6, ¶ 19.  Second, the Agreement specified that it "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."  *Id*. at p. 5, ¶ 16.  Third, the Agreement required that all subscription payments from BLI to Fairfield Sentry pass through Fairfield Sentry's New York HSBC bank account. *Id*. at pp. 1–2.  Finally, BLI specified that all redemption payments from Fairfield Sentry Investments "should be wired only to" to JPMorgan Chase Bank, New York at 270 Park Avenue,

New York, NY 10017, USA.  *Id*. at p. 11, ¶ 30(g).[6]

## Subscription and Redemption Payments

On January 4, 2007, BLI transferred $10 million in subscription payments to Fairfield

Sentry.  *See* Tsai Decl., ¶ 10.  On December 1, 2007, BLI transferred an additional $30 million in

subscription payments to Fairfield Sentry.  *See id*.  In accordance with the Agreement, BLI sent

the subscription payments from its JPMorgan account in Taiwan, through its accounts with

JPMorgan Bank in London (the "London JPMorgan Accounts")[7] to a JPMorgan account in New

York (the "New York JPMorgan Account"), to a New York account with HSBC Bank held by

Citco for Fairfield Sentry (the "New York HSBC Account").  *See* Subscription Agreement,

pp. 1–2, 11.  The funds were then transferred to Fairfield Sentry's account with Citco Bank

Nederland N.V., Dublin Branch in Ireland (the "Dublin Citco Account").  *See* Long Decl.,

Exs. 5, 6.  Given that at least 95% of Fairfield Sentry's funds had to be invested in U.S.

Securities utilizing BLMIS's SSC Strategy, *see* 2006 PPM, pp. 9-10, funds deposited in Fairfield

Sentry's Dublin Citco Account were transferred to the New York HSBC Account and then to

BLMIS's account at JP Morgan Chase in New York, *see* Long Supp. Decl., Ex. 5; Compl., ¶ 3.

On July 4, 2008, a BLI representative in Taiwan submitted a redemption request via fax

to Fairfield Sentry's administrator, Citco Fund Services (Europe) B.V. ("Citco") in the

Netherlands, specifying that redeemed funds should be wired to the New York JP Morgan

Account.  *See* Tsai Decl., ¶ 15; Tsai Supp. Decl., ¶ 6, Ex. A.

Shortly before the redemption request, on May 5, 2008, Fairfield Sentry withdrew $80

---

[6]  BLI either delivered the subscription documents or sent them by courier to Fairfield Sentry c/o Citco Fund
Services (Europe) B.V., Telestone 8 – Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.
*See* Tsai Decl., ¶ 11.

[7]  One of BLI's London JPMorgan Accounts was a USD account.  *See* Supplemental Declaration of Tsai, Chung-
Chun ("Tsai Supp. Decl.") (Dkt. No. 39), ¶ 3.

million from its BLMIS accounts. *See* Compl., Ex. B. On July 10, 2008, Fairfield Sentry

withdrew an additional $20 million, for a total of $100 million. *See id.* As alleged by the

Trustee in the Complaint, this $100 million was utilized by Fairfield Sentry to make redemption

payments to its shareholders, including but not limited to, BLI. *See* Compl., ¶¶ 34, 41,

Exs. B, C.

On August 18, 2008, following receipt of funds originating from BLMIS's JPMorgan

Account, Fairfield Sentry sent $42,123,406, an amount equivalent to the principal BLI invested

with a 5% return, from the Dublin Citco Account to the New York HSBC Account, on to the

New York JPMorgan Account and then to BLI's JPMorgan account in London. *See* Long Supp.

Decl., Ex. 2; Tsai Supp. Decl., Ex. A. In honoring BLI's redemption, Fairfield complied with

the wiring instructions BLI had specified in the Agreement and in its redemption request by

sending the redemption payments to the New York JPMorgan Account specified by BLI. *See*

Subscription Agreement, p. 11; Tsai Supp. Decl., Ex. A.

## **Procedural History**

On September 22, 2011, the Trustee filed the Complaint against BLI to recover the

$42,123,406 BLI received as a subsequent transferee from Fairfield Sentry. On November 23,

2011, counsel for the Trustee requested that the Clerk of the Court serve process on BLI pursuant

to 28 U.S.C. section 1608(b)(3)(B) by mailing a copy of a summons (the "Summons") and

Complaint, along with a certified Chinese translation of each, and an order setting the time to

respond (Dkt. No. 6). On December 6, 2011, the Clerk certified that BLI was served via Federal

Express Priority Mail with a copy of the Summons, Complaint, and an order setting the time to

respond (Dkt. No. 7). On February 3, 2012, Ettelman & Hochheiser, P.C. filed a motion to

dismiss on BLI's behalf (Dkt. No. 10). On April 19, 2012, the Trustee filed an opposition to the

motion to dismiss (Dkt. No. 16).  On May 2, 2012, Lowenstein Sandler PC filed a Substitution of

Counsel and Notice of Appearance (Dkt. No. 19), followed by a 35-page reply brief on June 14,

2012 (Dkt. No. 38).  On July 16, 2012, the Trustee filed a sur-reply brief (Dkt. No. 45).  A

hearing was held on August 8, 2012.

* * *

For purposes of this Motion to Dismiss, the material facts alleged by the Trustee in the

Complaint are accepted as true.  All reasonable inferences should be drawn in favor of the

plaintiff.  *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995).  The Court

"may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings,

such as affidavits," *Reiss v. Societe Centrale du Groupe Des Assurances Nationales*, 235 F.3d

738, 748 (2d Cir. 2000) (quotation omitted), and consider "all pertinent documentation submitted

by the parties," *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 178 n.2 (S.D.N.Y. 1995)

(quotation omitted).

## DISCUSSION

The Trustee's Complaint against BLI cannot be dismissed because (i) this Court has

subject matter jurisdiction under the FSIA, (ii) this Court has personal jurisdiction over BLI, (iii)

the Trustee may pursue recovery from BLI as a subsequent transferee because the initial transfers

from BLMIS to Fairfield Sentry are avoidable, and (iv) the Trustee's claims are not barred by the

presumption against extraterritoriality.  The Court addresses each point in turn.

## I.    THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE FSIA

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the

courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443

(1989).  Under the FSIA, foreign states are "presumptively immune from the jurisdiction of

United States courts; unless a specified exception applies." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). In the absence of such an exception, federal courts lack subject-matter jurisdiction over claims against foreign states. *Id.*

In evaluating whether a defendant is entitled to sovereign immunity under the FSIA, the defendant carries the initial burden of setting forth a *prima facie* case that it is a foreign state. *See Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993). If this showing is made, the burden shifts to the plaintiff, who must then produce evidence to demonstrate that immunity should not be granted under exceptions to the FSIA, "although the ultimate burden of persuasion remains with the alleged foreign sovereign." *Id.*

### a. BLI IS A "FOREIGN STATE" UNDER THE FSIA

The initial dispute centers on whether BLI qualifies as a "foreign state" entitled to immunity under the FSIA. The Act defines a "foreign state" as a "political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). BLI has produced evidence in the form of affidavits that it is an "agency or instrumentality" of the ROC. As averred in the affidavits, BLI (i) is a "political branch of the ROC in charge of the labor safety policies and handling of investments of the Labor Insurance Fund," Tsai Decl., ¶ 4, (ii) was created for a national purpose, namely "to protect Taiwan workers' livelihood and promote social security, as well as services related to social insurance, labor protection, and social welfare allowances," *id.* ¶ 2, and (iii) was established in accordance with Articles 4 and 5 of the Taiwan Labor Insurance Act to handle labor insurance affairs "under the direct authority of the Council of Labor Affairs of the Taiwan Executive Yuan, the executive branch of the government of the Republic of China." *Id; see also Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (finding the Korean Deposit Insurance Corporation to be a foreign state because, *inter alia*, it was a Korean governmental institution formed by statute, performed

functions traditionally performed by the government and many of its operations were overseen by the Korean government).

In an attempt to rebut this evidence, the Trustee argues in a footnote that BLI failed to provide sufficient proof that it is a foreign state. *See* Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC's Memorandum in Response to Defendant Bureau of Labor Insurance's Motion to Dismiss ("Tr. Opp.") (Dkt. No. 16), p. 5, n.2. Yet, a "plaintiff cannot defeat a claim of immunity under the FSIA by simply arguing that more proof is required to prove 'agency or instrumentality' status." *Kao Hwa Shipping Co., S.A. v. China Steel Corp.*, 816 F. Supp. 910, 915 (S.D.N.Y. 1993). Rather, the Trustee must specifically rebut BLI's persuasive evidence, which the Trustee has failed to do. *See id.* Moreover, it appears that the Trustee conceded at oral argument that BLI is a foreign state. *See* Transcript dated August 8, 2012 (Dkt. No. 48) ("Transcript"), p. 34, lines 12–13 ("Clearly investment by a foreign state's instrumentality, like we're dealing with in this case . . . ."). In light of the above, the Court finds that BLI is a foreign state and is thus immune from jurisdiction unless the Trustee can show that one of the exceptions to the FSIA applies.

### b.  THE THIRD CLAUSE OF THE COMMERCIAL ACTIVITY EXCEPTION APPLIES

The Trustee contends that BLI is not immune from jurisdiction because all three clauses of the commercial activity exception under the FSIA apply. This exception denies immunity to a foreign state in any case in which the underlying action is based:

> [i] upon a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2); *Republic of Argentina v. Weltover*, 504 U.S. 607, 611 (1992).

The Court finds that it has subject matter jurisdiction over the instant action under at least

the third clause of the commercial activity exception.  Under this clause, a foreign state is subject

to suit in the United States where the suit is based upon an act (i) that occurs outside the United

States in connection with a commercial activity of the foreign state outside the United States, and

(ii) causes a direct effect in the United States.  28 U.S.C. § 1605(a)(2); *Weltover*, 504 U.S. at

611.

### i. Commercial Activity And The Act

In evaluating whether this third clause applies, the Court first addresses whether BLI's

investment activity with Fairfield Sentry constitutes "commercial activity" under the Act.

Congress has left much latitude to courts to determine which state acts constitute commercial

activity under the FSIA.  *See NML Capital, Ltd. v. The Republic of Argentina*, 680 F.3d 254, 258

(2d Cir. 2012) (finding that the legislative history of the FSIA "explicitly asserts the

congressional intention to leave to the courts . . . a great deal of latitude in determining what is a

commercial activity for purposes of [the FSIA].") (quotation omitted).

The FSIA defines "commercial activity" as "either a regular course of commercial

conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  The basic inquiry

in determining whether an activity is "commercial" is "whether the activity is of the type an

individual would customarily carry on for profit."  *De Letelier v. Republic of Chile,* 748 F.2d

790, 797 (2d Cir. 1984).  Therefore, "a state engages in commercial activity . . . where it

exercises only those powers that can also be exercised by private citizens as distinct from those

powers peculiar to sovereigns."  *Nelson*, 507 U.S. at 360 (quotation omitted).  The Supreme

Court has found, for example, "a foreign government's issuance of regulations limiting foreign

currency exchange" to be a sovereign activity "because such authoritative control of commerce

cannot be exercised by a private party," while "a contract to buy army boots or even bullets is a

'commercial' activity, because private companies can similarly use sales contracts to acquire

goods." *Weltover*, 504 U.S. at 614–15; *see also* H.R. Rep. 94-1487 at 6615 (1976) (noting that "commercial activity" under the FSIA includes a foreign government's "investment in a security of an American corporation").

Here, as BLI's investment activity, including buying and redeeming shares from Fairfield Sentry, could have been carried out by a private individual for profit; such activity did not involve the use of powers peculiar to sovereigns.[8]   Accordingly, BLI's investment activity in Fairfield Sentry constitutes commercial activity under the FSIA.

With respect to the necessary "act" under the statute, BLI's signing of the Agreement and sending out the corresponding subscriptions payments, as well as making the redemption request, constitute acts that transpired outside of the United States in connection with BLI's commercial activity.   The Court now addresses whether these acts had a direct effect in the United States.

### ii.   Direct Effect in the United States

The Second Circuit has called for courts to liberally construe what constitutes "direct effect in the United States" to provide access to courts for plaintiffs who have been wronged. *See, e.g., Texas Trading*, 647 F.2d at 312 ("Courts construing either ['direct' or 'in the United States'] should be mindful . . . of Congress's concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign . . . .") (citation omitted) (overruled on other grounds).   Courts should inquire whether the United States has an interest in the action such that "Congress would have wanted an American court to hear the case."

---

[8]  Although never formally argued, BLI presented evidence that it made its redemption request for a national purpose: "BLI was requested by the Council of Labor Affairs of the executive branch of the ROC to redeem the overseas investment and return the cash to ROC to stabilize the operation of Labor Insurance Fund." Tsai Decl., ¶ 14.  Whether a state acts as a private party, however, is a question of behavior rather than motivation. *See Saudi Arabia*, 507 U.S. at 360–61.  "In other words, the relevant inquiry concerns the power that is exercised, rather than the motive for its exercise." *NML Capital, Ltd. v. the Republic of Argentina*, 680 F.3d 254, 259 (2d Cir. 2012).  Accordingly, an assertion of a governmental motive or national purpose does not change the fact that BLI engaged in conduct in which a private party could customarily engage for profit.  Indeed, "it is irrelevant *why* [BLI]" made the investments and requested the redemptions "in the manner of a private actor; it matters only that it did so." *Weltover,* 504 U.S. at 614, 617.

*Id.* at 313.

The Supreme Court has found that "an effect is direct if it follows as an immediate consequence of the defendant's . . . activity." *Weltover,* 504 U.S. at 618 (quotation omitted); *see also Martin v. Republic of S. Africa*, 836 F.2d 91, 95 (2d Cir. 1987) ("The common sense interpretation of a 'direct effect'" within the meaning of section 1605(a)(2) "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption.") (quotation omitted). To establish a direct effect in the United States, the United States "need not be the location where the *most* direct effect is felt, simply *a* direct effect." *Hanil Bank v. P.T. Bank Negara Indonesia (Persero),* 148 F.3d 127, 133 (2d Cir. 1998) (emphasis in original). Courts tend to refrain from finding a direct effect, however, if such effect in the United States is merely fortuitous or incidental, playing only a tangential role in the lawsuit. *See, e.g.*, *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993) (finding no direct effect where "the sole act connected to the United States[,] . . . the drawing of a check on a bank in New York, was entirely fortuitous and entirely unrelated to the liability of the appellees"); *United World Trade v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1237 (10th Cir. 1994) (finding no direct effect where "the defendants' performance of their contractual obligations had no connection at all with the United States").

Here, BLI's actions caused a direct effect in the United States by causing a two-way flow of funds to and from New York-based BLMIS: *to* BLMIS for investment in U.S. Securities and U.S. Treasuries and *from* BLMIS in the form of profits from those investments. This flow of funds in the form of subscription and redemption payments into and out of BLMIS in the United States via Fairfield Sentry was part of a specific investment structure explicitly set forth in the

14

Subscription Agreement and the PPMs.[9]  These documents stated that: (i) Fairfield Sentry was required to invest at least 95% of its assets in the Split Strike Conversion Strategy utilized and controlled by BLMIS in New York; (ii) BLMIS was to act as sub-custodian of these assets, holding them in segregated accounts in New York; and (iii) BLMIS was to invest these assets in U.S. Securities and Treasuries.

In light of this structure, upon signing the Subscription Agreement, BLI triggered the transfer of $40 million in subscription payments from its account in Taiwan to Fairfield Sentry through New York banks, ultimately to be held and invested by BLMIS.  So, too, in making its redemption request, BLI triggered a transfer of over $42 million (including over $2 million in profit) from BLMIS's accounts in New York, through New York banks, finally to BLI abroad.

This movement of money to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous or incidental; instead, it was "the ultimate objective" and the "*raison d'etre*" of the Agreement between BLI and Fairfield Sentry.  *Filetech S.A. v. France Telecom, S.A.*, 212 F. Supp. 2d 183, 197 (S.D.N.Y. 2011).  Indeed, these transfers form the basis for the Trustee's entire suit; the Trustee would not have brought this lawsuit but for them.  These transfers, therefore, "bear[] a jurisdictionally relevant relationship to the [instant] cause[] of action."  *Broadfield Fin., Inc. v. Ministry of Fin. of the Slovak Republic*, 99 F. Supp. 2d 403, 406 (S.D.N.Y. 2000).  In sum, BLI's acts causing the flow of funds to and from BLMIS in New York for the purpose of investment and profit are sufficient to satisfy the direct effects test under the commercial activity exception of the FSIA.[10]

---

[9]  BLI was aware of this investment structure, not only because it read and executed these Agreements as a self-proclaimed "Professional Investor," *see* Subscription Agreement, p. 3, ¶ 5(c), but also because BLI hired a consultant, Union Securities, to conduct diligence on Fairfield Sentry and its investment strategies, *see* Long Decl., Exs. 1, 2.

[10]  In addition, BLI's redemption request directly resulted in a sizeable financial loss for (i) a United States entity, BLMIS, and (ii) BLMIS customers who will receive less of a distribution from the Trustee's customer fund if the

1. <u>BLI's Counterarguments Are Unavailing</u>

BLI advances several arguments against finding that BLI's commercial activity abroad had a direct effect in the United States, none of which are persuasive.  <u>First</u>, BLI contends that the Trustee has failed to identify any transfer from BLMIS that was a direct effect of BLI's redemption request, having submitted only a hefty exhibit to his Complaint without parsing out the individual transfers.  Such contention is erroneous, as the Trustee has sufficiently identified such transfers.  In particular, the Trustee showed that on May 5, 2008, Fairfield Sentry withdrew $80 million from its BLMIS accounts and then withdrew an additional $20 million on July 10, 2008, for a total of $100 million.  *See* Compl., Ex. B.  The Trustee has alleged that Fairfield Sentry used this $100 million to make redemption payments to its shareholders, including but not limited to, BLI's redemption payment on August 18, 2008 in the amount of $42,123,406.  *See* Compl., ¶¶ 34, 41, Exs. B, C.[11]

<u>Second</u>, BLI suggests that the transfer of $42,123,406 was not an "immediate" effect of the redemption request because (i) "45 days elapsed between BLI's July 4, 2008 redemption request to Citco in the Netherlands and Fairfield's August 18, 2008 transfer of $42,123,406 to BLI," Reply Memorandum of Law in Further Support of Defendant Bureau of Labor Insurance's

---

$42 million were to remain with BLI.  At oral argument, counsel for BLI cited to *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993): "[T]he fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the [direct effect] exception."  *See* Transcript, p. 16, line 25; p. 17, lines 1–3.  <u>First</u>, as demonstrated above, BLMIS's financial loss is not the only direct effect BLI's actions had in the United States.  <u>Second</u>, *Antares* is distinguishable because there, the entire tort upon which the lawsuit was based transpired in Nigeria; the only nexus to New York was the money paid from a New York bank account to Nigeria.  Here, in contrast, the Trustee's lawsuit is based entirely on the transfers of funds themselves in and out of New York-based BLMIS.

[11]  BLI then argues that the sequence of these transfers shows that there was no direct effect between BLI's redemption request and Fairfield Sentry's honoring of its request.  Yet, as explained *supra*, BLI's "acts" taken together, including signing of the Subscription Agreement, making subscription payments and making a redemption request, had a direct effect in the United States because, as contemplated by the Agreements, they caused money to flow (i) from BLI to Fairfield Sentry to BLMIS in the form of subscription payments and (ii) from BLMIS to Fairfield Sentry to BLI in the form of redemption payments.

Motion to Dismiss the Complaint ("BLI Reply") (Dkt. No. 38), p. 18, and (ii) Fairfield Sentry

acted as an intervening factor, *id*. at pp. 17-18 ("To the extent Citco or Fairfield [Sentry], in

response to BLI's redemption request, elected to fund the redemption of BLI's shares by

requesting BLMIS in New York to transfer funds to Fairfield [Sentry], such intervening acts

broke the chain of causation between *BLI's* redemption request and any direct effect in the

United States.") (emphasis in original).   BLI's arguments regarding immediacy are incorrect

because there were no intervening acts that broke the chain of causation between BLI's

redemption request and any direct effect in the United States.   *See Martin*, 836 F.2d at 95

(finding a consequence is "immediate" when there is "no intervening element, but, rather, flows

in a straight line without deviation or interruption") (quotation omitted).   Here, money flowed

from subscribing shareholders to Fairfield Sentry, and ultimately to BLMIS (95% of the funds),

and then back from BLMIS to Fairfield Sentry, and ultimately to the redeeming shareholders,

which was the exact investment structure to which BLI consented through its execution of the

Agreement and the PPMs.   As such, despite a 45-day delay, the redemption request was

"immediate."   In addition, to explain this time lag, the Trustee pointed out at oral argument that

in accordance with the Agreements, redemption requests were made by the 15th day of the

month, shares were valued as of the end of the month, and payment took place 15 days later.   *See*

Transcript, p. 40; lines 15-20.

Finally, BLI posits that the Trustee has not satisfied the direct effect requirement because

he has failed to point to a "legally significant act" *in the United States* that had a direct effect in

the United States.   To that end, BLI cites cases for the proposition that legally significant aspects

of the lawsuit must occur within the United States.   *See, e.g.*, *Hanil*, 148 F.3d at 133; *Antares*,

999 F.2d at 36.  The Second Circuit has recently clarified,[12] however, that it is not necessary for the legally significant acts to have transpired in the United States.  *Giurlando*, 602 F.3d at 76 ("[W]e do not interpret the 'legally significant act' test as one requiring that the foreign state have 'performed' an act 'in the United States.'").  Rather, courts now hold that the legally significant acts test "requires that the conduct having a *direct effect* in the United States be *legally significant conduct* in order for the commercial activity exception to apply."  *Id.* at 77 (emphasis in original) (internal quotation omitted).  BLI's acts outside of the United States, including signing the Subscription Agreement, making subscription payments, and making its redemption request, constitute legally significant acts that form the basis for the Trustee's instant action.

At bottom, this is not a situation where "the ripples caused by an overseas transaction manage eventually to reach the shores of the United States."  *Virtual Countries, Inc. v. Republic of S. Africa*, 300 F.3d 230, 236 (2d Cir. 2002).  Rather, BLI intended to profit from BLMIS in New York through investments in Fairfield Sentry.  As a result, the United States clearly has an interest in this action such that Congress would have wanted an American court to hear the case.

For the reasons explained above, BLI's Motion to Dismiss for lack of subject matter jurisdiction is DENIED.

## II.     THE COURT HAS PERSONAL JURISDICTION OVER BLI

While the Second Circuit recently confirmed that foreign states are not "persons" that can "avail themselves of the fundamental safeguards of the Due Process Clause," *Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 399–400 (2d Cir.

---

[12] Indeed, cases decided before and shortly after *Weltover* caused confusion because a requirement of performance of a legally significant act "in" the United States "would conflate the provisions of the third clause with those of the second clause" of section 1605(a)(2).  *Giurlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 76 (2d Cir. 2010).

2009) (quotation omitted), it remains unclear, however, whether agencies and instrumentalities of foreign states enjoy due process protections. *See id.* at 400 ("[H]olding that a sovereign state does not enjoy due process protections does not decide the precise question in this case, because SOCAR is not a sovereign state, but rather an instrumentality or agency of one."). This Court need not resolve the exact status of BLI, however, because "in any event . . . the due process requirements have been met here." *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 134 (2d Cir. 1998).

In order to be subjected to personal jurisdiction in the United States, due process requires that a defendant have sufficient minimum contacts with the forum in which defendant is sued "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[13] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Miliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991). These minimum contacts must represent some "act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *Parex Bank*, 116 F. Supp. 2d at 422; *see also Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75, 80 (Bankr. S.D.N.Y. 2009) (finding that for the exercise of specific jurisdiction, minimum contacts exist "where a foreign defendant purposefully direct[s] his activities at residents of the forum and the underlying cause of action arise[s] out of or relate[s] to those activities") (alteration in original) (quotation omitted). "The defendant's activity need not have taken place within the forum, and a single transaction with the forum will suffice." *Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 117 (Bankr.

---

[13] There are two types of personal jurisdiction; general and specific. Under the facts, it is clear that there is no general jurisdiction because BLI did not have "continuous and systematic" contact with the U.S. Accordingly, the Court conducts an analysis only as to whether it has specific jurisdiction over BLI.

S.D.N.Y. 2011) (citations omitted).  While a choice of law clause is not always dispositive as to

personal jurisdiction, *see Zibiz Corp. v. FCN Tech. Solutions*, 777 F. Supp. 2d 408, 421

(E.D.N.Y. 2011), it "is a significant factor in a personal jurisdiction analysis because the parties,

by so choosing, invoke the benefits and protections of New York law," *Sunward Elecs., Inc. v.

McDonald*, 362 F.3d 17, 23 (2d Cir. 2004).

BLI argues that its due process rights would be violated if it were subjected to this

Court's personal jurisdiction due to its "isolated contacts with the United States."  Memorandum

of Law in Support of Defendant's Motion to Dismiss ("BLI Mem. Law") (Dkt. No. 10), p. 8.[14]

"Indeed, it would be unfair to force BLI to defend itself in the United States for simply having

funds which it invested in an entity outside of the United States and ultimately ended up in an

account located at BLMIS."  *Id*. at 11.

BLI's argument is disingenuous because BLI's investments in Fairfield Sentry did not

merely "end up" in an account at BLMIS as a result of happenstance or coincidence.  Rather,

BLI purposefully availed itself of the benefits and protections of New York laws by knowing,

intending and contemplating that the substantial majority of funds invested in Fairfield Sentry

would be transferred to BLMIS in New York to be invested in the New York securities market.

BLI not only was a self-proclaimed "Professional Investor," but also hired Union Securities to

conduct diligence on Fairfield Sentry and its investment strategies.  *See* Long Decl., Exs. 1, 2.

---

[14]   To support this point, BLI emphasizes that various isolated banking arrangements, standing alone, are insufficient
to establish personal jurisdiction under the FSIA.  *See, e.g.*, *Licci v. Am. Exp. Bank. Ltd.*, 704 F. Supp. 2d 403,
407 (S.D.N.Y. 2010) (holding that a foreign defendant must have more of a connection to the forum state than
"mere maintenance" of a correspondent or intermediary bank account there to suffice for personal jurisdiction);
*Canadian Grp. Underwriters Ins. Co. v. M/V "Arctic Trader"*, No. 96-9242, 1998 WL 730334, at *3 (S.D.N.Y.
Oct. 19, 1998) ("*Standing alone*, the existence of a bank account is insufficient to exercise jurisdiction over a
foreign defendant in New York, especially where the function of the account is only to wire funds to an overseas
bank.") (emphasis added).  As detailed above, the New York accounts through which the subscription and
redemption payments passed were not merely maintained by BLI, nor is personal jurisdiction over BLI rooted in
the mere existence of these accounts.  Instead, as the Trustee's allegations make clear, BLI directed its
investment towards the forum State, thereby purposefully availing itself of the benefits and protections of New
York laws.

As part of this diligence, BLI was furnished with a private placement memorandum and other information about Fairfield Sentry, including specifics about the Fund's investment strategy and past results and trades in the S & P 100. *See* Long Decl., Ex. 1, pp. 1–6, 10. On BLI's behalf, Union Securities learned that the Fund's "strategy is executed by [BLMIS]," *id*. at 2, and the PPM highlighted BLMIS's central role in Fairfield Sentry's investment strategy, *see id.* at Ex. 4, p. 15. It explicitly stated that (i) Fairfield Sentry was required to invest at least 95% of its assets in the SSC utilized and controlled by BLMIS in New York; (ii) BLMIS was to act as custodian of these assets, holding them in segregated accounts in New York; and (iii) BLMIS was to invest these assets in U.S. Securities and Treasuries. *Id.*; 2006 PPM, p. 21; *see* Compl., ¶ 3; Subscription Agreement, p. 1, ¶ 3, Ex. 6.[15] Armed with the fruits of this diligence, BLI signed the Subscription Agreement, which incorporated the PPMs.

In a nutshell, BLI invested tens of millions of dollars in Fairfield Sentry with the specific purpose of having funds invested in BLMIS in New York, and intended to profit from this U.S.-based investment. As such, BLI cannot claim a violation of its due process rights from having to appear in a New York court to defend itself in a suit arising from activities with a clear New York nexus. *See In re BLMIS*, 460 B.R. at 119 (finding no serious burden "where [the defendant's] counsel is in New York and there is a U.S. nexus to its economic activities, and given that 'the conveniences of modern communication and transportation' also militate against finding hardship based on lack of proximity") (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002)). Accordingly, this Court has personal

---

[15] Further evidencing the strong nexus with New York, the Agreement contains a New York choice of law clause and a New York forum selection clause. *See* Subscription Agreement, pp. 5, 6 (indicating the Agreement "shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions" and requiring BLI to "irrevocably submit[] to the jurisdiction of the New York courts").

jurisdiction over BLI.

As a final jurisdictional argument, BLI asserts that this Court lacks both subject matter and personal jurisdiction because BLI invested only in Fairfield Sentry, never directed its funds to BLMIS, and, in fact, had no contact with BLMIS.  In support of its point, BLI cites to *In re Aozora Bank Ltd.*, 11-CIV-5683, 2012 WL 28468 (S.D.N.Y. Jan. 4, 2012), contending that when it purchased ownership interests in Fairfield Sentry, (i) the investment became the sole property of Fairfield Sentry, which exercised exclusive control over the investment and directed the money to BLMIS, and (ii) the investors had no direct control over the funds and did not directly invest the money in BLMIS.

BLI's argument is erroneous because it conflates the concept of jurisdiction with the notion of a "customer" under SIPA, two entirely different standards requiring completely different analyses.[16]  That BLI intended to purposefully avail itself of the forum warrants a finding of personal jurisdiction over BLI, but does not necessarily warrant any finding regarding customer status under SIPA.  *See SIPC v. BLMIS (In re Bernard L. Madoff)*, 454 B.R. 285, 301 n.22 (Bankr. S.D.N.Y. 2011) (holding that "in light of the nature of the . . . investments in the Feeder Funds," intent to invest ultimately with BLMIS is "of no consequence" to this Court's finding regarding customer status).

* * *

Having addressed jurisdiction, the Court now turns to two issues of first impression; (i) whether the Trustee, as a matter of law, may recover from BLI as a subsequent transferee ("Avoidance Issue"), and (ii) whether the Trustee's claims are barred by the presumption against

---

[16] Indeed, the *Aozora* court never addressed jurisdiction; it analyzed only which parties are entitled to SIPA customer claims.  *See* 2012 WL 28468, at *3.

extraterritoriality ("Extraterritoriality Issue").[17]    Before delving into the merits, a brief

background is appropriate.

On May 18, 2009, the Trustee filed a complaint against the initial transferee, Fairfield

Sentry, seeking, *inter alia*, the avoidance of all transfers from BLMIS to Fairfield Sentry during

the six year period prior to the Filing Date totaling $3,054,000,000.  *See* Adv. Pro. No. 09-1239,

Dkt. No. 1.  Shortly thereafter, the Eastern Caribbean Supreme Court in the High Court of Justice

of the Virgin Islands (the "BVI Court") entered an order initiating the wind up of Fairfield

Sentry.   On May 9, 2011, the Trustee and the Fairfield Sentry Joint Liquidators at that time

entered into a written settlement (the "Settlement" or "Settlement Agreement")[18] wherein

Fairfield Sentry (i) agreed to pay $70 million to the Trustee, (ii) reduced its customer claim by

nearly $730 million and (iii) entered into a consent judgment against it in favor of the Trustee for

the entire amount of the initial transfers sought to be avoided by the Trustee (totaling

$3,054,000,000).   The Settlement Agreement stated that "the Judgments may be used by the

Trustee to prosecute a Subsequent Transferee Claim, and then for the purpose of establishing the

avoidance of the Withdrawals."  Settlement Agreement, ¶ 24.

On June 10, 2011, following a hearing on the Trustee's Bankruptcy Rule 9019 Motion[19],

---

[17]  Judge Rakoff of the United States District Court, Southern District of New York, has withdrawn the reference in certain adversary proceedings to adjudicate these issues.  The Extraterritoriality Issue has been fully briefed and oral argument was held on September 21, 2012.  The Avoidance Issue is in the process of being briefed and oral argument is scheduled for November 30, 2012.  *See* 12-MC-00115 (JSR) (Dkt. Nos. 167, 314).  As BLI never moved to withdraw the reference and is not a party to the aforementioned adversary proceedings, these issues remain before this Court.  In a recent order, Judge Rakoff noted that "to the extent that the issues overlap, whichever court reaches its issue first can provide guidance for the other."  *See* Order, 12-MC-00115 (JSR) (Dkt. No. 214).  In the instant decision, this Court addresses only those arguments presented before it.

[18]  *See* Form of Agreement Between the Trustee and Kenneth Krys and Joanna Lau, Solely in Their Respective Capacities as the Foreign Representatives for and Joint Liquidators of Fairfield Sentry Limited, Fairfield Sigma Limited and Fairfield Lambda Limited [hereinafter "Settlement" or "Settlement Agreement], Adv. Pro. No. 09-1239, Dkt. No. 69, Att. 2 (Ex. A).

[19]  Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy Procedure Approving an Agreement by and Between the Trustee and Kenneth Krys and Joanna Lau, Solely in Their Respective Capacities as the Foreign Representatives for and

this Court approved the Settlement conditioned upon its approval by the BVI Court.  On June 24, 2011, the BVI Court approved the Settlement and on July 13, 2011, this Court entered the consent judgment against Fairfield Sentry.  BLI incorrectly asserts that the consent judgment was the product of improper collusion and "collaboration among liquidation trustees with one common goal, settle the current dispute and go after secondary transferees."  BLI Mem. Law, p. 14.  Instead, the Settlement was the result of a court-approved settlement process that (i) recognized the limited funds available to recover from an insolvent entity, and (ii) avoided the gratuitous costs and delays involved in adjudicating to judgment the Trustee's claims against Fairfield Sentry.  *See* Bench Memorandum and Order Granting Trustee's Motion for Entry of Order Approving Agreement (Adv. Pro. No. 09-1239, Dkt. No. 92), p. 3.  In approving the Settlement, this Court acknowledged that part of the value of the settlement was the consent judgment, which allowed the Trustee to seek recovery of funds against other parties in the future. *See id*. at p. 4 ("[T]he Trustee's and the Foreign Representatives' proposed joint litigation strategies provide for the assignment of claims, and allocation of recoveries, to the BLMIS estate, enhancing the Trustee's ability to achieve the substantially greater sums from third parties for ultimate distribution to creditors and customers of the BLMIS estate.").  As set forth *infra*, the Court also recognized and preserved the rights of subsequent transferees to raise defenses and contest the avoidability of the initial transfers.  *See* Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019(a) of the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee and Kenneth Krys and Joanna Lau, Solely in Their Respective Capacities as the Foreign Representatives for and Joint Liquidators of Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited, p. 3.

---

Joint Liquidators of Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited [hereinafter "Bankruptcy Rule 9019 Motion"] (Adv. Pro. No. 09-1239, Dkt. No. 69).

With respect to the Avoidance Issue and the Extraterritoriality Issue, BLI seemingly moves to dismiss under Rule 12(b)(6), which allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6); FED. R. BANKR. P. 7012(b).  When considering a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).

The Court now turns to the merits of these issues.

## III.   THE TRUSTEE MAY PURSUE RECOVERY FROM BLI AS SUBSEQUENT TRANSFEREE UNDER SECTION 550 OF THE CODE BECAUSE THE INITIAL TRANSFERS FROM BLMIS TO FAIRFIELD SENTRY ARE AVOIDABLE

The issue before the Court is whether Section 550 requires a trustee to formally avoid an initial transfer to permit recovery against a subsequent transferee or if the mere avoidability of such transfer is sufficient.

Section 550 provides:

> [T]o the extent that a transfer is avoided under [an avoidance provision in the Code], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).  BLI argues that the Trustee is barred from seeking recovery from BLI as a subsequent transferee because the Trustee, having entered into a settlement agreement, did not obtain a full and final judgment of avoidance against the initial transferee, Fairfield Sentry.  The Court disagrees.  Under these circumstances, the Trustee may recover from BLI under Section 550 because the Trustee timely filed a complaint against Fairfield Sentry alleging that the initial transfers from BLMIS to Fairfield Sentry are "avoidable" under section 548 of the Code.  *See Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. J.P. Morgan Chase*

25

*Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 741 (Bankr. S.D.N.Y. 2008)

("Avoidable . . . describes a transaction that can be voided . . . but that is valid until annulled.")

(quotations and citations omitted).  Indeed, the majority of courts have found that Section 550

requires a transfer be avoidable; it does not require a trustee to litigate a final judgment of

avoidance against initial transferees before seeking recovery from subsequent transferees.

5 COLLIER ON BANKRUPTCY, ¶ 550.02[1] at 550-6 (16th Ed. 2011) ("The better view, adopted by

the majority of courts is that . . . a recovery may be had from a subsequent transferee without

suing the initial transferee."); *see, e.g., IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,

408 F.3d 689, 708 (11th Cir. 2005) ("Section 550(a) does not mandate a plaintiff to first pursue

recovery against the initial transferee and successfully avoid all prior transfers against a mediate

transferee."); *Kendall v. Sorani (In re Richmond Produce Co.)*, 195 B.R. 455, 463 (N.D. Cal.

1996) ("[O]nce the trustee proves that a transfer is *avoidable* under section 548, he may seek to

recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is

made.") (emphasis added); *Woods & Erickson LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721,

735 (B.A.P. 9th Cir. 2008) ("[A] trustee is not required to avoid the initial transfer from the

initial transferee before seeking recovery from subsequent transferees under § 550(a)(2)."); *In re

M. Fabrikant & Sons, Inc.*, 394 B.R. at 745–46 ("The plaintiff can proceed directly against the

[subsequent transferees] and "avoid" the initial transfer as to them.").  Further, there is nothing in

Section 550 suggesting "that recovery from immediate transferees is in any way dependent upon

a prior action or recovery against the initial transferee . . . .  On the contrary, avoidability is an

attribute of the transfer rather than that of the creditor."  *In re Richmond Produce Co.*, 195 B.R.

at 463 (quotation omitted).

Only one district court case in the Second Circuit has addressed this issue.  *See Enron*

*Creditors Recovery Corp. v. Int'l Fin. Corp. (In re Enron Creditors Recovery Corp.)*, 388 B.R. 489 (S.D.N.Y. 2008).  In *Enron*, the bankruptcy court was confronted with a situation where it was impossible and impractical for the trustee to obtain a judgment of avoidance against the initial transferee, CLO Holdings, "because there was no CLO Holdings and there was no CLO trustee.  The special purpose entity [CLO] . . . had been collapsed."  *See In re Enron Creditors Recovery Corp.*, Hearing Transcript ("Enron Transcript"), No. 07-6597, Dkt. No. 32, Apr. 16, 2008, at p. 17, lines 21–24.  As such, while the district court agreed with the bankruptcy court that Section 550 usually requires a formal avoidance of a transfer before permitting recovery from a subsequent transferee, it emphasized that it was "necessary to leave open the possibility of an exception where[,] for legal or practical reasons[,] it is *impossible or impractical* to satisfy the precondition of an avoidance."  *See* Enron Transcript at p. 37, lines 15–25; p. 38, lines 1–10 (emphasis added).

In essence, the district court found that Section 550 must be construed flexibly to avoid harsh and inequitable results.  Specifically, it noted that "two [sic] ready an application of the requirement of the condition precedent can amount to forfeiture.  And in this application it would bar the trustee from seeking recovery of assets that arguably should be recovered for the bankrupt . . . and the creditors thereof."  *Id.* at p. 38, lines 11-15; *see also id*. at p. 38, lines 16-21 ("[W]e are involved with statutory extensions of laws of equity and I think we should inform the way that the bankruptcy code and rules are interpreted not in the feasance of literal terms, but, certainly, where there is sufficient ambiguity to allow such we can satisfy *both literal rule and equity* . . . .") (emphasis added).

The *AVI* court echoed the district court's sentiments that Section 550 "should be interpreted to provide flexibility."  *In re AVI, Inc.*, 389 B.R. at 735.  In the context of settlements

in particular, it relied on such flexibility to "avoid [the] absurd result" of precluding a trustee from "pursuing subsequent transferees after settling with an initial transferee who does not admit liability." *Id.* (emphasis added). The court emphasized that "Congress could not have contemplated this outcome in enacting § 550" because it would lead to trustees having "little incentive to partially settle avoidance actions, thereby running up the costs of litigation and causing further delay." *Id.*

Under the present circumstances where a settlement is at play, rigidly construing Section 550 to require a formal avoidance against Fairfield Sentry before permitting recovery from BLI makes little sense. It was "impractical" for the Trustee to obtain such a judgment against Fairfield Sentry because it would have entailed protracted, expensive litigation with an insolvent entity in the midst of a liquidation proceeding with little chance of meaningful recovery.[20] *See* Affidavit of Irving H. Picard,[21] (Adv. Pro. No. 09-1239) (Dkt. No. 71), Attachment 5, Ex. D , ¶¶ 4, 7 (Trustee attesting that, using his business judgment, he believed it preferable to settle with Fairfield Sentry rather than engage in an exercise of futility to litigate to a full and final judgment of avoidance). In addition, such a requirement would lead to the "absurd result" of forcing the Trustee to choose between engaging in such burdensome litigation with the insolvent initial transferee on the one hand, or forever forfeiting the right to recover from all subsequent transferees on the other. To avoid such an impractical result, the Court construes Section 550 flexibly to require only avoidability to pursue recovery from BLI.

The above notwithstanding, the Trustee will still be required to prove that the transfers

---

[20] As a result of the Settlement, the Trustee is entitled to recover only $70 million, a mere two percent of the approximately $3 billion consent judgment against Fairfield Sentry. *See* Settlement Agreement, ¶¶ 1-2.

[21] Affidavit of Irving H. Picard, Trustee, In Support of Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy Procedure Approving Agreements Between the Trustee and Greenwich Sentry, L.P., and Greenwich Sentry Partners LP.

from BLMIS to Fairfield were fraudulent and improper in connection with its suit against BLI as subsequent transferee because the Trustee's Settlement with Fairfield Sentry did not involve any determination on the merits as to the initial transfers.[22]  So, too, BLI will be afforded its due process rights to contest the avoidability of these initial transfers.  *See Dye v. Sachs* (*In re Flashcom, Inc.*), 361 B.R. 519, 525 (Bankr. C.D. Cal. 2007) ("[A] stipulated or default judgment entered in an avoidance action does not preclude the defendants in a recovery action from disputing the avoidability."); *Thompson v. Jonovich* (*In re Food & Fibre Protection, Ltd.*), 168 B.R. 408, 416 (Bankr. D. Ariz. 1994) (finding that a default judgment did not preclude defendants from asserting their due process rights to dispute avoidability of the initial transfer and raise whatever defenses were available to the initial transferee); *Morris v. Emprise Bank* (*In re Jones Storage and Moving, Inc.*), No. 00-14862, 2005 WL 2590385 (Bankr. D. Kan. Apr. 14, 2005).  That BLI should be afforded this right to dispute is a notion the Trustee does not contest. *See* Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC's Memorandum in Response to Defendant Bureau of Labor Insurance's Motion to Dismiss (Dkt. No. 16), p. 29 ("[T]hese cases merely hold that subsequent transferees' rights to due process afford them the opportunity to contest the avoidability of initial transfers, to the extent that issue was not fully adjudicated in a prior proceeding—a proposition that the Trustee does not contest.").

BLI further argues that since the Settlement did not constitute a true avoidance, it failed to trigger the one-year statute of limitations under section 550(f) of the Code. *See* 11 U.S.C. § 550(f) (stating the trustee must initiate recovery actions against subsequent transferees within "one year after the avoidance of the transfer").  To avoid the absurd result of

---

[22]  In fact, there was an express denial of liability with regard to the initial transfers.  *See* Settlement Agreement, ¶ 24 ("This Agreement . . . will not be deemed to be a presumption, concession or admission by any Party of any fault, liability or wrongdoing whatsoever.").

section 550(f) of the Code never starting to run, BLI asserts that "the Court should apply the two-year statute of limitations contained in 11 U.S.C. § 546(a) to the Trustee's claims against BLI." *See* BLI Reply, p. 27; 11 U.S.C. § 546(a)(1)(A) (stating the trustee must initiate an avoidance proceeding within two years after entry of the bankruptcy petition). BLI contends that since the Trustee's Complaint against BLI was filed over two years after the bankruptcy petition, the suit is time-barred. BLI's arguments in this regard are erroneous. Although the Settlement does not constitute a formal avoidance of the initial transfer from BLMIS to Fairfield, it presents the Court with finality with respect to Fairfield Sentry. This finality triggers the relevant one-year statute of limitations under section 550(f) of the Code. Without such a trigger, the Trustee would be permitted to bring suit against a subsequent transferee for an indefinite amount of time, a highly inequitable result. *See ASARCO LLC v. Shore Terminals LLC*, No. C 11-01384, 2012 WL 2050253, at \*5 (N.D. Ca. June 6, 2012) (finding that a judicially approved settlement triggered the statute of limitations because any other result "would undermine the certainty that statutes of limitations are designated to further," and because otherwise "the statute of limitations would be indefinite because a triggering event might never occur"). Whether the Court looks at the date that (i) the Trustee's Bankruptcy Rule 9019 Motion was granted (June 7, 2011), (ii) a final order from this Court approving the Settlement was entered (June 10, 2011), (iii) a final order from the BVI court approving the Settlement was entered (June 24, 2011), or (iv) a consent judgment was entered against Fairfield Sentry by this Court (July 13, 2011), the Trustee's suit against BLI, commenced on September 22, 2011, was well within the one-year statute of limitations and is therefore deemed timely.

In light of the above, the Motion to Dismiss on these grounds is DENIED.

## IV.  **THE TRUSTEE'S CLAIMS ARE NOT BARRED BY THE PRESUMPTION AGAINST EXTRATERRITORIALITY**

The final issue before the Court is whether the Trustee's claims against BLI under Section 550 are barred by the presumption against extraterritoriality.

The Supreme Court recently reaffirmed the presumption against extraterritoriality, which assumes that, unless Congress indicates otherwise, its legislation applies only within the territorial jurisdiction of the United States.  *See Morrison v. Nat. Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) ["*Morrison*"].  This principle "represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate" and "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters."  *Id.*  As such, "unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions."  *Id.* (quotations omitted).

In light of this presumption, BLI argues that the Trustee improperly seeks to apply Section 550 extraterritorially to transfers that BLI received from Fairfield Sentry overseas.  BLI is incorrect, however, because (i) the Trustee is not seeking to apply Section 550 extraterritorially, making this presumption inapplicable, and (ii) even if the Trustee were seeking to apply this section extraterritorially, Congress expressed clear intent to permit such an application.  Accordingly, the Trustee's claims against BLI pursuant to Section 550 are not barred by the presumption against extraterritoriality.

### A. **The Presumption Against Extraterritoriality Does Not Apply Under These Circumstances**

As demonstrated below, in light of the "focus" test annunciated in *Morrison*, in conjunction with pragmatic considerations, the Court finds that the Trustee is not seeking to apply Section 550 extraterritorially and, therefore, the presumption against extraterritoriality is

not implicated in the instant Motion to Dismiss.

### a.   The "Focus" Test Under *Morrison*

In determining whether a statute is being applied domestically or extraterritorially, the Supreme Court in *Morrison* annunciated a transactional test centered on the "focus" of a statute, namely, the "objects of the statute's solicitude," and what the statute "seeks to regulate."  130 S. Ct. at 2883–84.  If the acts or objects upon which the statute focuses are located in the United States, application of the statute is domestic and the presumption against extraterritoriality is not implicated, even if other activities or parties are located outside the United States.  *See id.* at 2884–85; *SEC v. Gruss*, No. 11-Civ-2420, 2012 WL 1659142, at **8–10  (S.D.N.Y. May 09, 2012) (finding no extraterritorial application where focus of Investment Advisor Act was on investment advisers and fraud was perpetuated by domestic investment advisor against foreign clients); *see also Lapiner v. Camtek, Ltd.*, No. C 08–01327, 2011 WL 445849, at *2 (N.D. Cal. Feb. 2, 2011) (denying motion to dismiss on extraterritorial grounds because focus of act was domestic even though "the conduct on which [the] plaintiff's claims are based took place outside of the United States, specifically in Israel, and that the majority of [the] stock is, purportedly, held in Israel").

As demonstrated by the text and structure of the avoidance and recovery sections of the Code, their focus is on the improper depletion of the bankruptcy estate's assets.  *French v. Liebmann (In re French)*, 440 F.3d 145, 154 (4th Cir. 2006) ("[T]he Code's avoidance provisions protect creditors by preserving the bankruptcy estate against illegitimate depletions."). These avoidance and recovery provisions work in tandem to further the Code's policy of maximizing the value of the bankruptcy estate by permitting a trustee to avoid certain transfers that deplete the estate and recover the payments for the benefit of creditors.  *See Lassman v. Patts (In re Patts)*, 470 B.R. 234, 243 (Bankr. D. Mass. 2012) ("These sections of the

Bankruptcy Code must be read in conjunction when assessing a trustee's avoidance and recovery action, the purpose of which is to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.01[1][a] (16th ed. 2010) ("[S]ection 548 serves the goal of increased creditor dividends by allowing the estate representative to avoid offending transactions, and bring the property back into the debtors' estate for distributions to creditors.").

Specifically, the focus of the avoidance and recovery sections is on the initial transfers that deplete the bankruptcy estate and not on the recipient of the transfers or the subsequent transfers.  For example, the avoidance sections focus on the transfers themselves, including the timing of the transfers, *see, e.g.,* 11 U.S.C. §§ 547(b)(4), 548(a)(1),(b), their purpose, *see, e.g.,* 11 U.S.C. § 548(a)(1)(A), and their effect on the transferor, *see, e.g.,* § 548(a)(1)(B).  Further, the recovery section that governs the Trustee's claims against BLI, Section 550, is titled "Liability of transferee of avoided transfer." 11 U.S.C. § 550; *see Gruss*, 2012 WL 1659142, at *9 ("[A] title of a statute or section can aid in resolving any ambiguity in the legislation's text.") (quotation omitted).  It makes no mention of the transfer from the initial transferee to the subsequent transferee; indeed, recovery from a subsequent transferee is grounded solely on the basis of it possessing a fraudulent transfer.  *See* 11 U.S.C. § 550.  Moreover, as "a court's recovery power is generally coextensive with its avoidance power," it is logical that the relevant transfer for purposes of the presumption against extraterritoriality is only the transfer that is to be avoided, namely the initial transfer.  *See Diaz-Barba v. Kismet Acquisition, LLC*, No. 08-CV-1446, 2010 WL 2079738, at *8 (S.D. Cal. May 20, 2010).

Looking at the instant facts, the Trustee's application of Section 550 is domestic because the depletion of the BLMIS estate occurred in the United States.  The BLMIS Ponzi scheme was

operated in the United States and the funds used to operate the scheme were received and disbursed to investors in the United States.  Specifically, the transfers at issue originated from BLMIS's New York JPMorgan Account and went to Fairfield Sentry's New York HSBC Account.  These acts, which occurred domestically, are the "objects of the statute's solicitude," and what the statute "seeks to regulate," *Morrison*, 130 S. Ct. at 2884.  As the focus of Section 550 occurred domestically, the fact that BLI received BLMIS's fraudulently transferred property in a foreign country does not make the Trustee's application of this section extraterritorial.  *See id*. at 2884–85; *Gruss*, 2012 WL 1659142, at **8–10; *Lapiner*, 2011 WL 445849, at *2.

### b.  <u>Pragmatic Considerations</u>

In addition, finding that the Trustee could not recover assets fraudulently transferred abroad, as BLI argues, would, from a practical standpoint, render hollow the avoidance and recovery provisions of the Code, an outcome clearly unintended by Congress.  In particular, if the avoidance and recovery provisions ceased to be effective at the borders of the United States, a debtor could end run the Code by "simply arrang[ing] to have the transfer made overseas," thereby shielding them from United States law and recovery by creditors.  *In re Maxwell Communication Corp.*, 186 B.R. at 816.  Congress did not intend for this absurd result of according "an invariable exemption from the Code's operation to those who leave our borders to engage in fraud."  *French*, 440 F.3d at 155 (Wilkinson, J., concurring).  This is especially so given the prevalence of special purpose offshore entities engaging in financial and commercial activities in the United States.  Moreover, "nothing is better settled[] than" the responsibility of courts to assure that statutes receive "a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion."  *Johnson v. U.S.*, 529 U.S. 694, 707 n.9 (2000) (quoting *In re Chapman*, 166 U.S. 661, 667 (1897); *see also Gruss*, 2012 WL 1659142, at *10 (finding congressional silence did not implicate the

presumption against extraterritorially because "[n]ot every silence is pregnant . . . . An inference

drawn from congressional silence certainly cannot be credited when it is contrary to all other

textual and contextual evidence of congressional intent") (quoting *Burns v. U.S.*, 501 U.S. 129,

136 (1991)).[23]  Accordingly, the Court declines to adopt BLI's position in this regard.

### c. *Maxwell* is Distinguishable From The Instant Facts

Although BLI relies heavily on *Maxwell Communication Corp. plc v. Barclays Bank (In*

*re Maxwell Communication Corp. plc)*, 170 B.R. 800 (Bankr. S.D.N.Y.1994), where the court

found Section 547 of the Code could not be applied extraterritorially, *aff'd sub nom. Societe*

*General plc v. Maxwell Communication Corp. plc (In re Maxwell Communication Corp. plc)*,

186 B.R. 807 (S.D.N.Y. 1995), *aff'd on other grounds*, 93 F.3d 1036 (2d Cir. 1996), *Maxwell* is

distinguishable on its facts.

First, application of Section 547 was extraterritorial in *Maxwell* because the focus of the

statute, depletion of the debtor's estate, occurred abroad; preferential transfers were made by a

United Kingdom corporation from its accounts located abroad to recipients also located abroad.

*See id.* at 809.  Indeed, the *Maxwell* court expressly limited its holding to instances where the

Debtor was not a United States entity and the transfers occurred abroad to other foreign entities.

*See id.* at 814 ("To be clear, I do not hold today that no debtor may pursue a transfer overseas.

What I do hold is that where a foreign debtor makes a preferential transfer to a foreign transferee

and the center of gravity of that transfer is overseas, the presumption against extraterritoriality

---

[23] The analysis above applies equally to subsequent transferees.  If foreign subsequent transferees were insulated from recovery actions, the avoidance and recovery provisions of the Code would likewise be rendered ineffective.  A debtor could engineer transfers to end up in the possession of foreign parties, thus preventing recovery by a trustee.  Indeed, "[t]he cornerstone of the bankruptcy courts has always been the doing of equity, and in situations such as this, where money is spread throughout the globe, fraudulent transferors should not be allowed to use § 550 as both a shield and a sword. Not only would subsequent transferees avoid incurring liability, but they would also defeat recovery and further diminish the assets of the estate." *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 707 (11th Cir. 2005) (quotation and citation omitted).

prevents utilization of section 547 to avoid the transfer."); *id.* at 808, n.13 ("Much as I would

relish the opportunity to address whether a debtor which is a U.S. entity could use section 547 to

recover a preference made to a foreign creditor, I think it is best to refrain from such *dicta*.").  In

contrast, application of Section 550 here is domestic because, as discussed *supra*, the depletion

of the BLMIS estate occurred in the United States.

Second, the Second Circuit declined to reach whether the presumption against

extraterritoriality barred application of Section 547 abroad and ultimately affirmed the lower

courts on comity grounds.  *Maxwell*, 93 F.3d at 1054–1055 (electing not to "decide whether,

setting aside considerations of comity, the 'presumption against extraterritoriality' would compel

a conclusion that the Bankruptcy Code does not reach the pre-petition transfers at issue").

Employing a comity analysis, the Second Circuit held that as *Maxwell* involved a debtor subject

to joint insolvency proceedings in the United States and the United Kingdom, "the doctrine of

international comity precludes application of the American avoidance law to transfers in which

England's interest has primacy."  *Id.* at 1055.  This reasoning has no applicability to the instant

case, where BLMIS is not subject to parallel liquidation proceedings in another court.[24]

In light of the above, the Trustee's application of Section 550 is purely domestic and is

therefore not barred by the presumption against extraterritoriality.

**B.   Congress Expressed Clear Intent For Extraterritorial Application of Section 550**

Even if the application of Section 550 were extraterritorial under these facts, which it is

not, Congress expressed clear intent for such an application and the presumption against

---

[24]   In addition, comity is an affirmative defense that BLI has the burden of proving.  *See Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1996).  As BLI has not argued that comity concerns prevent the application of Section 550 to its receipt of fraudulent transfers from BLMIS, the Court need not address the issue.

extraterritoriality "must give way when Congress exercises its undeniable 'authority to enforce its laws beyond the territorial boundaries of the United States.'" *French*, 440 F.3d at 151 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  A statute need not include a clear statement declaring "this law applies abroad" to rebut the presumption, and statutory context may be consulted "in searching for a clear indication of statutory meaning." *U.S. v. Weingarten*, 632 F.3d 60, 65 (2d Cir. 2011) (citing *Morrison*, 130 S. Ct. at 2883).  Moreover, "reference to nontextual sources is permissible" and "all available evidence" should be considered in determining congressional intent. *Id.* (quotations omitted); *see also French*, 440 F.3d at 151 ("To determine whether Congress has expressed such an affirmative intention, courts may look to . . . the text of the statute, the overall statutory scheme, and legislative history."). However, broad boilerplate terms in statutes are insufficient to overcome the presumption against extraterritoriality. *Morrison*, 130 U.S. at 2882.

Congress demonstrated its clear intent for the extraterritorial application of Section 550 through interweaving terminology and cross-references to relevant Code provisions. Specifically, (i) "property of the estate," under Section 541, includes all property worldwide; (ii) the avoidance provisions of Sections 544(b), 547, and 548 (the "Avoidance Provisions"), incorporate the language of Section 541 – "an interest of debtor in property" – to delineate the extent to which transfers can be avoided, i.e., that which would have been property of the estate but for the improper transfer can be avoided; and (iii) Section 550 explicitly authorizes the recovery of all transfers that have been avoided, which necessarily includes overseas property.

With respect to Section 541, it defines "property of the estate" as, *inter alia*, all "interests of the debtor in property as of the commencement of the case," 11 U.S.C § 541(a)(1), "wherever located and by whomever held."  11 U.S.C § 541(a).  In accord with the broad language of this

37

section, courts have universally held that property of the estate extends to any property located worldwide. *See, e.g.*, *Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998) (explaining that property of the estate "includes property outside the territorial jurisdiction of the United States"); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (noting that "wherever located" is broadly construed "to include property located in and outside of the U.S.").

The Avoidance Provisions grant a trustee the power to avoid certain prepetition transfers "of an interest of a debtor in property." *See* 11 U.S.C. § 544(b), 547, 548. These sections' reference to the "interest of the debtor in property"—the same term used in Section 541—is not coincidental. Rather, as discussed by the Supreme Court in the context of preferential transfers under section 547 of the Code, property subject to avoidance is defined by "property of the estate" in Section 541. As explained by the Court, section 541 "delineates the scope of 'property of the estate' and serves as the postpetition analog to § 547(b)'s 'property of the debtor." *Begier v. I.R.S.*, 496 U.S. 53, 58–59 (1990). This is because (i) "'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings" and (ii) "the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate." *Id.* at 58.

In circumstances similar to the instant proceeding, the Fourth Circuit concluded that the Avoidance Provisions' reference to Section 541 also incorporates that section to permit the avoidance of overseas transfers.

> By incorporating the language of § 541 to define what property a trustee may recover under his avoidance powers, § 548 plainly allows a trustee to avoid any transfer of property that would have been "property of the estate" prior to the transfer in question-as defined by § 541-even if that property is not "property of

> the estate" now.  Through this incorporation, Congress made manifest its intent
> that § 548 apply to all property that, absent a prepetition transfer, would have
> been property of the estate, *wherever that property is located.*

*French*, 440 F.3d at 151–52 (4th Cir. 2006) (citations omitted) (emphasis altered).  Section 548's incorporation of "property of the estate" as defined in Section 541 "is not merely broad, boilerplate language that arguably contemplates application beyond the territorial jurisdiction of the United States."  *Kollias v. D & G Marine Maint.*, 29 F.3d 67, 74 (2d Cir. 1994).  That is, Congress explicitly incorporated the language of Section 541 to allow a trustee to maximize recoveries for the bankruptcy estate by permitting the avoidance of any transfer that would have been property of the estate, which necessarily includes assets fraudulently transferred outside the United States.  *See French*, 440 F.3d at 152 ("Congress thus demonstrated an affirmative intention to allow avoidance of transfers of foreign property that, but for a fraudulent transfer, would have been property of the debtor's estate.").

Section 550, in turn, allows a trustee to recover any transfer to the extent it has been avoided.  *See* 11 U.S.C. § 550.  This section's use of the term "transfer" specifically refers to all transfers "avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title."  *Id.*  As such, by incorporating the avoidance provisions by reference, Section 550 expresses the same congressional intent regarding extraterritorial application. Thus, Congress expressed intent for the application of Section 550 to fraudulently transferred assets located outside the United States and the presumption against extraterritoriality does not apply.

BLI argues that the definition of property of the estate in Section 541 cannot form the basis for the extraterritorial application of the avoidance and recovery sections in the Code because under Second Circuit precedent, fraudulently transferred assets are not property of the estate until they are actually recovered.  *See* BLI Reply, p. 32 (citing *FDIC v. Hirsch (In re Colonial Reality Co.)*, 980 F.2d 125, 131 (2d Cir 1992)).  BLI therefore urges this Court to adopt

the view of *Barclay v. Swiss Fin. Corp. (In re Midland Euro Exchange, Inc.)*, 347 B.R. 708 (C.D. Cal. 2006), which criticized the holding of *French* for the same reason. *Id.* at 717–18. Both BLI and the court in *Midland Euro Exchange*, however, misunderstand *French*'s holding. In *French*, extraterritorial application of Section 548 was not premised on fraudulently transferred assets constituting actual property of the estate prior to recovery. *See French*, 440 F.3d at 151 n.2 ("Because we hold that § 548 applies to the transfer in this case even assuming that § 541's definition of 'property of the estate' does not by itself extend to the [fraudulently transferred property], we need not join this dispute [on whether fraudulently transfers are property of the estate prior to recovery]."). Rather, as explained above, Section 548's reference to Section 541 expressed congressional intent to grant the Trustee authority to avoid and recover *all transfers* that, but for a fraudulent transfer, would have been property of the estate, even if not currently property of the estate. This grant of authority includes assets fraudulently transferred overseas because but for the fraudulent transfer, assets located overseas would undeniably be property of the estate.

In light of the above, the Motion to Dismiss on these grounds is DENIED.

## **CONCLUSION**

For the reasons set forth herein, BLI's Motion to Dismiss is hereby DENIED.[25]

**IT IS SO ORDERED**.

Dated: New York, New York                    /s/ Burton R. Lifland
       October 11, 2012                          United States Bankruptcy Judge

---

[25] The Court notes that notwithstanding the approach of the Trustee seeking to recover all $42 million from BLI in the instant suit, in light of potential "value" defenses available under the Code, it is conceivable that BLI would be liable only for its net winnings.